UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| VINCENT ZITO, individually and on behalf of all others similarly situated, | § § § | |
| PLAINTIFFS, | § § | |
| v. | § § | CASE NO. |
| UNITED TECHNOLOGIES CORPORATION, UTC FIRE & SECURITY CORPORATION, WALTER KIDDE PORTABLE EQUIPMENT, INC., d/b/a KIDDE SAFETY, and KIDDE FIRE SAFETY, | § § § § § § § | |
| DEFENDANTS. | § § | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

Plaintiff Vincent Zito, individually and on behalf of a Class of similarly situated consumers, alleges:

### I. PRELIMINARY STATEMENT

1.      There are two principal types of technologies used in smoke alarms for purposes of smoke and fire detection: ionization, used in ionization smoke alarms, and photoelectric, utilized in photoelectric smoke alarms. But smoke alarms that only use ionization technology (hereafter "Ionization Smoke Alarms") are incapable of performing their intended and expected job of detecting smoke from smoldering fires or the smoldering phase of flaming fires (hereafter "Smoldering Fires")—the most common type of home fire. Ionization Smoke Alarms may take 30 minutes or longer to detect and warn of a Smoldering Fire, and thus do not alert people in time for them to escape the

harm caused by the buildup of toxic fumes, gases, and smoke inhalation.

2.     Consumers buy Ionization Smoke Alarms to do one thing, and one thing only: sound their alarms to warn of a hazardous fire in time for them to escape the life-threatening dangers of smoke inhalation, toxic gases and fumes, and fire. Ionization Smoke Alarms are categorically incapable of performing this function. Yet, Defendants continue to profit from selling Ionization Smoke Alarms even though they know—and have known for years—that these products do not do the one thing they are supposed to do in the case of Smoldering Fires, the most common type of house fire.

3.     This case seeks redress for Defendants' ongoing failure to disclose that their Ionization Smoke Alarms—the overwhelming majority of the Smoke Alarms they sell to consumers throughout the United States—are not fit to detect and warn of most home fires and therefore pose an unreasonable safety hazard.

## II. JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class consists of more than 100 members, the amount in controversy exceeds the sum or value of five million dollars ($5,000,000.00) exclusive of recoverable interest and costs, and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims of Plaintiffs and the Class occurred in this District. Furthermore, venue is proper in this District because Plaintiff purchased an Ionization Smoke Alarm in this District in Lisbon, Connecticut for Plaintiffs' residence located in Thompson, Connecticut.

## III. PARTIES

6.     Plaintiff, Vincent Zito, resides in Thompson, Connecticut. Mr. Zito brings this action individually and as a representative of a Class of similarly situated consumers.

7.     Defendant United Technologies Corporation is a Delaware corporation with its principal place of business in Hartford, Connecticut.

8.     Defendant UTC Fire & Security Corporation is a Delaware corporation with its principal place of business in Farmington, Connecticut.

9.     Defendant Walter Kidde Portable Equipment, Inc., d/b/a Kidde Safety, is a Delaware corporation with its principal place of business in Mebane, North Carolina.

10.     Defendant Kidde Fire Safety is a Delaware corporation with its principal place of business located in Mebane, North Carolina.

11.     Defendants are referred to collectively throughout this Complaint as "Defendants."

12.     Defendants, including their owners, employees, parent companies, subsidiaries, affiliates, and agents, developed, designed, manufactured, assembled, tested, inspected, marketed, promoted, advertised, warranted, distributed, sold, packaged, and/or provided warnings and instructions for the Ionization Smoke Alarms branded "Kidde."

13.     Defendants conduct substantial business within Connecticut and throughout the United States through the marketing, distribution, and sale of Ionization Smoke Alarms.

## IV. FACTS

14.     Defendants make and sell Ionization Smoke Alarms under the brand name "Kidde." For years, Defendants have known of the dangers posed by the design of these

Ionization Smoke Alarms: they fail to adequately detect and, thus, to timely alert people to Smoldering Fires in their homes. For years, Defendants have purposefully concealed and failed to adequately disclose this unreasonable safety hazard to Class members and the public. As a result, hundreds of thousands if not millions of homeowners across the country have purchased one or more Ionization Smoke Alarms (or a home with one or more of them installed) without knowing that they will not perform the function for which they are needed.

**A.    General Allegations**

15.    Smoldering Fires typically emit lots of smoke, but little or no flame. For example, a smoldering couch might emit plumes of toxic smoke for a long period of time before developing into a flaming fire. Smoldering Fires generally occur when people are asleep, and are thus responsible for more deaths than flaming fires; indeed, studies show a high fatality rate related to Smoldering Fires, which are the most common type of fire in residential settings.

16.     Photoelectric smoke alarms effectively and safely detect slow Smoldering Fires. However, less than 5% of all smoke alarms sold in America are photoelectric smoke alarms.

17.    Ionization Smoke Alarms, despite being labeled "Smoke Alarms," are designed to detect smaller particulates caused by open flames and do not reliably detect the type of smoke caused by Smoldering Fires. Yet, approximately 95% of Smoke Alarms sold in America are Ionization Smoke Alarms. The ionization chamber in all Ionization Smoke Alarms sold in America is fundamentally the same: the technology has not materially changed in over 30 years.

18.     Defendants have known for decades that Ionization Smoke Alarms do not detect smoke from the majority of fires leading to death and serious injury in residences, namely Smoldering Fires, in time to alert people of the danger—and they have nevertheless not adequately disclosed this material safety information to consumers. For example:

- One 1984 study comparing the response times of ionization versus photoelectric detectors found that "[t]he photoelectric smoke detector operated 1 hour and 8 minutes, 29 seconds before the first ionization detector in the smoldering-started fire. In this test, all photoelectric detectors in the room, as well as the photoelectric detectors in the corridor beyond the closed door, responded before the first ionization detector."[1] Some ionization detectors never responded at all to the smoldering fires.

- In 1986, researchers in Australia concluded that "[p]hotoelectric alarms sighted in the hallway are more effective for detecting smoldering smoke than ionization alarms, providing adequate escape time for most conditions of size and location of the smoke sources. Ionization alarms sited in the hallway generally provide inadequate escape times…."[2]

- In 1991, Norwegian researchers found that "[t]he ionization alarms detected smoke from a smoldering fire much later than optical (photoelectric) alarms. When the particular conditions during the fire development are taken into consideration there are reasons to indicate that this detection principle (ionization) would not provide adequate safety during this type of fire."[3]

- In 2001, two researchers found that even though Ionization Smoke Alarms were being sold for less money, the fire protection community had become increasingly critical of these detectors because they are insensitive to smoldering fires and are much more likely to sound nuisance alarms. According to these researchers, "…we [the fire protection community] believe there is already sufficient justification for promoting photoelectric detectors in family dwellings."[4]

---

[1] Cote, P.E., Drouin, J.A., "Smoke and Heat Detector Performance: Field Demonstration Tests Results", Fire Journal (January 1984) pp. 34-38, 69.
[2] Brown, S.K., Johnson, P.F., "Smoke Detection of Smoldering Fires in a Typical Melbourne Dwelling," Fire Technology, Vol. 22, No 4, November 1986, pp. 295-310.
[3] Meland, Oysten, and Lonuik, Lars, "Detection of Smoke - Full Scale Tests with Flaming and Smouldering Fires, "Fire Safety Science," - Proceedings of the Third International Symposium, July, 1991, pp. 975-984.
[4] Berger, Lawrence and Kuklinski, Diana, "When Smoke Alarms are a Nuisance—A Call to Action," Arch. Pediatr. Adoclesc. Med., Vol. 155, Aug. 2001, pp. 875-876.

- The National Institute of Standards and Technology (NIST) published a study in 2004 (updated in 2007) that found "photoelectric alarms provide (often) considerably faster response to smoldering fires than ionization type alarms." In a smoldering fire, the ionization-only detector lagged behind the photoelectric-only detector by 47 to 54 minutes. The NIST data also demonstrates that under certain conditions associated with a smoldering fire, an ionization-only detector sounds only after the home's occupants have been exposed to deadly levels of smoke and fumes.

- In 2006, the Australian Government's Commonwealth Scientific and Industrial Research Organisation found that scientific test data shows ionization smoke detectors fail to activate until "dangerously high and totally unacceptable" levels of smoke—more than twice the maximum safe level of smoke set for photoelectric detectors.

- In 2008, the International Association of Fire Fighters proposed a resolution to support the "mandate of only photoelectric smoke detectors in United States and Canadian federal law" primarily because ionization detectors may not operate in time, if at all, to alert occupants early enough to escape from smoldering fires. Its President, Harold Schaitberger, said changing to photoelectric detectors will "drastically reduce loss of life among citizens and firefighters."

- In 2008, Senator John Kerry wrote a letter to the Consumer Product Safety Commission (CPSC) urging the CPSC to remove Ionization Smoke Alarms from the marketplace and to warn consumers of their limitations. Senator Kerry understood that the CPSC had expressed serious concerns regarding Ionization Smoke Alarms as early as 1995, yet it had not taken any positive action. Senator Kerry emphasized that recent research and several studies confirmed the "inherent danger of ionization detectors" in failing to alarm occupants to smoldering fires, on average 30 minutes slower than photoelectric detectors. "The ionization smoke alarms [sic] susceptibility to nuisance alarms (leading to disablement) and inadequate response to smoldering fires could be responsible for hundreds of needless deaths each year."

- In the last ten years, the CPSC has received more than two thousand complaints from consumers, many of which specifically report the failure of Defendants' Ionization Smoke Alarms to detect smoldering fires in residential settings. In turn, the CPSC has provided these complaints to Defendants.

19.     Underwriters Laboratory (UL) tests all smoke alarm models to a minimum performance standard created more than thirty years ago by private industry. UL puts smoke alarms through four different tests for fast-flaming fires, but only one to measure

response to Smoldering Fires—the UL 217 smoke box test. If the smoke alarm sounds before smoke reaches a 10% obscuration rate (the smoke density surrounding the smoke alarm must not exceed 10% per foot, or "10%/ft"), then the smoke alarm passes the test and UL reports it as compliant with its standard.

20.     But the smoke box test uses only one material to test the smoke alarm's sensitivity to Smoldering Fires: white pine, which releases smoke similar to what would be released from cotton mattresses commonly found in homes in the 1970's. Modern furniture is generally made of synthetic materials that generate radically different smoke particles during Smoldering Fires. Instead of cotton, most homes now contain furniture made of polyurethane that emits large amounts of smoke and deadly gases for which Ionization Smoke Alarms are exceptionally insensitive. The smoke box test is, thus, outdated—and the test procedures and certification protocol have not undergone any significant changes during the 30 years since their inception.

21.     In November of 1999, the Washington Post published an article criticizing UL for its approval of Ionization Smoke Alarms that are "designed to pass UL laboratory tests [but] didn't work in real world situations."[5] The author found that of 350 Ionization Smoke Alarms that failed to sound an alarm in residential fires, about 1/3 passed the UL standard after being sent back to the manufacturer for retesting. In 1994, the CPSC informed UL that its Smoldering Fire test "does not represent the smoke in residential fires," but neither UL nor Defendants have taken the necessary steps to change the standard.

---

[5] Caroline E. Mayer, UL Drawing Fire on Product-Safety Tests, Washington Post, November 26, 1999, http://articles.latimes.com/1999/nov/26/business/fi-37723 (last accessed April 7, 2015).

22.     The article discussed the inherent conflict between UL and manufacturers whose products UL tests and approves. The majority of voting members of the UL 217 committee consists of representatives from the smoke alarm industry, consultants paid by the manufacturers, and UL employees. Thus, most UL product safety decisions and performance standards are made in private, in consultation with product manufacturers. Ninety percent of UL's $400,000,000.00+ revenue comes from testing manufacturers' products; UL also receives additional revenue from companies who use UL's seal on their products.

23.     Certain members of the UL 217 committee who are unaffiliated with the smoke alarm industry proposed a new addition to the testing standard for UL 217 that would test for real world fire conditions. This proposed standard would subject both Ionization Smoke Alarms and photoelectric smoke alarms to polyurethane flaming and smoldering tests.

24.     The CPSC staff supported the proposed change in a letter to the UL 217 Standards Technical Panel (STP) dated November 18, 2014:[6]

> Reducing the fire death rate requires alerting occupants with enough time to exit the home safely before the conditions become untenable. This has become particularly important because today's homes are furnished with increasing numbers of synthetic materials, including polyurethane foam, which can produce thick, dark smoke. CPSC staff has been concerned that the present UL 217 standard for performance tests for fires may not be sufficient in adequately addressing today's fire hazards. As a member of the task group that participated in helping develop the foundation for the proposed flaming polyurethane and smoldering polyurethane tests, CPSC staff agrees that the present proposed tests will increase the overall performance of residential smoke alarms by subjecting smoke alarms to new smoke characteristics (small and large particle sizes, counts, rates, and colors) that are not captured in the present UL 217 performance tests.

---

[6] http://www.cpsc.gov//Global/Regulations-Laws-and-Standards/Voluntary-Standards/Voluntary-Standards-Reports/CPSClettertoUL217November2014(2).pdf (last accessed April 7, 2015).

The CPSC staff acknowledged that the "UL 217 STP has a difficult task of weighing the tradeoffs in accepting the Polyurethane Flaming and Smoldering Tests with thresholds that challenge [the design of] today's smoke alarms, but importance of offering earlier fire detection cannot be overlooked." According to industry experts, this "challenge" is particularly applicable to Ionization Smoke Alarms, as none of them could pass the proposed polyurethane smoldering test.

25.     The letter concludes: "To adequately address today's fire hazards, CPSC staff encourages the STP to accept both recommended changes to UL 217 regarding the addition of the Polyurethane Flaming and Smoldering Tests to the UL 217 standard because it achieves the goal of improving smoke alarm performance."

26.     In support of its conclusion, CPSC staff used NIST data on escape rates during smoldering and flaming fire scenarios: "The present UL proposal is for an alarm threshold of 7%/ft obscuration for the flaming polyurethane test and 12 %/ft obscuration limit for the smoldering polyurethane test. According to Table 10, this corresponds to between 60 to 72 percent average occupant successful escape rate and 93 percent average occupant successful escape rate, respectively."

27.     Based on this data, the CPSC staff opines that the proposed test would nearly double successful escapes from smoldering fires—from 45-49% to 93%. Despite the increased success rate and recommendations of the CPSC staff, the UL 217 Standards Technical Panel failed to adopt it.

28.     The CPSC publishes a "Manufacturer's Guide To Developing Consumer Product Instructions" to encourage effective presentation of safety and hazard information. Safety and hazard messages must "stand out from other messages and be

immediately recognized as safety-critical. They must make clear the hazard, its consequence, and what to do about it."[7] The message must be explicit, unambiguous, and should contain signal words like DANGER, WARNING, or CAUTION that are preceded by a safety alert symbol; vague descriptions of the hazard that are not clearly presented as a danger or warning are not recommended. Additionally, CPSC suggests that safety messages be placed where consumers are likely to read them, and should be in a unique format that highlights the warning or hazard, such as large-size text or contrasting colors.

### B.    Purchase of Defendants' Ionization Smoke Alarms by Mr. Zito and the Class

29.    Instead of providing a reasonable disclosure that warns of the material safety information, Defendants' deceptive packaging—a representative copy of which is attached as Exhibit A—contains the following:

- The front of the package prominently describes its contents in large type as a "Smoke Alarm." In type almost as large, the front of the package promises "Easy Installation," "Fewer Callbacks," and "User-Friendly Features." The top of the package also describes its contents as a "Smoke Alarm" in large type.

- The left side of the package recites some installation specifications underneath the "Smoke Alarm" description, and, in prominent type, states "Complies with the following authorities," the first of which is UL. The right side of the package recites more installation specifications.

- The bottom of the package, near the upper right-hand corner, also includes the large-type "Smoke Alarm" description. Near the lower right-hand corner, in large type, are the words "Ionization Technology." In the center, in small, boldface, ALL-CAPS type, is the following sentence: "WARNING: REMOVAL OF THE ALARM BATTERY AND DISCONNECTING OR LOSS OF A.C. POWER WILL RENDER THIS ALARM INOPERATIVE. BATTERY DOOR WILL NOT CLOSE UNLESS BATTERY IS INSTALLED CORRECTLY." [8]

30.    Notably, Defendants deliberately fail to disclose that the Ionization Smoke

---

[7] http://www.cpsc.gov/pagefiles/103077/guide.pdf at p.45 (last accessed April 7, 2015).
[8] *See* Exhibit A hereto.

Alarms will not alert residents of slow smoldering fires in time for them to escape toxic fumes and gases, smoke inhalation, and other life-threatening effects of Smoldering Fires. Nor do Defendants disclose that that the Ionization Smoke Alarms may take more than 30 minutes to sound an alarm in a Smoldering Fire, if at all.

31.     Defendants purposefully do not provide any warning at all about the limited capability of what they sell as a "Smoke Alarm" to actually detect and timely alert a person to the presence of smoke from a dangerous Smoldering Fire. Accordingly, a reasonable consumer, like Mr. Zito, cannot possibly understand the dangers of purchasing Defendants' Ionization Smoke Alarms.

32.     Above the "WARNING" on Defendants' packaging, but in slightly smaller, regular type, is the following language:

> "Kidde strongly recommends that both ionization and photoelectric smoke alarms be installed to help insure maximum detection of the various types of fires that can occur within the home. Photoelectric sensing alarms may detect invisible fire particles (associated with flaming fires) sooner than ionization alarms. This alarm features an ionization sensor designed to detect products of combustion using the ionization technique, it contains 0.9 microcurie of Americium 241, a radioactive material."[9]

Defendants' "recommendation" that "both ionization and photoelectric smoke alarms be installed to help insure maximum detection" entirely and purposefully fails to inform the purchaser of an Ionization Smoke Alarm that, despite its label calling it a "Smoke Alarm," it will not sense and timely alert them to the presence of a smoking, Smoldering Fire.

33.     Purchasers of Ionization Smoke Alarms (and homes with Ionization Smoke Alarms installed) reasonably expect and understand that the sole and intended purpose of the Ionization Smoke Alarms is to alert and/or warn them and other home occupants in time to safely escape home fires, *including* the most common, deadly

---

[9] *See* Exhibit A hereto.

Smoldering Fires.

34.     Class members and the public do not understand the difference between Ionization Smoke Alarms and photoelectric smoke alarms, and they do not understand the undisclosed defect of Defendants' Ionization Smoke Alarms. Researchers have found that a lack of general consumer education about smoke alarm types creates the global perception that all smoke alarms are technologically the same and as effective. This results in the average consumer purchasing the least expensive smoke alarm possible, instead of the safest and most reliable.[10] Consumer Reports concluded that "[s]ince consumers view both detectors as being equally efficient, they will always buy the lower priced detector."[11]

35.     On October 30, 2014, Mr. Zito bought an Ionization Smoke Alarm from Home Depot in Lisbon, Connecticut for his home. At Home Depot, he looked at the front and back of the package to confirm that the smoke alarm was battery-operated and easy to install. He did not see anything telling him or otherwise understand that the Ionization Smoke Alarm would not detect and timely alert him to a Smoldering Fire.

36.     Mr. Zito reasonably expected that the Ionization Smoke Alarm would provide him adequate protection from all types of home fires. Even if Mr. Zito had carefully scrutinized and understood every single side of the package and read every single word printed on it, , he would still reasonably not have been aware that the Ionization Smoke Alarm would not in fact alert him to the smoke of a slow Smoldering Fire in time for him to escape toxic fumes and gases, smoke inhalation, and other life-

---

[10] "When Smoke Alarms Are a Nuisance," (Berger & Kuklinski, 2001).

[11] Consumer's Union, "Smoke Detectors, Essential for Safety," Consumer Reports. (May 1994) pp. 336-339.

threatening effects of Smoldering Fires, or that the Ionization Smoke Alarm may take more than 30 minutes to sound an alarm in a Smoldering Fire, if at all. These are, thus, material omissions and concealed facts about the material safety hazards inherent in Defendants' Ionization Smoke Alarms.

37.     When making their purchasing decisions, Mr. Zito and Class members, like all reasonable consumers, had no reason to suspect the material safety hazards inherent in Defendants' Ionization Smoke Alarms.

38.     Had Defendants disclosed that Ionization Smoke Alarms are not designed to and do not reliably alert residential occupants early enough to safely escape the dangers of smoldering home fires, Mr. Zito and Class members would not have purchased Ionization Smoke Alarms.

39.     For years, Defendants have failed to disclose that their Ionization Smoke Alarms are not effective life-saving devices, because the Ionization Smoke Alarms do not provide adequate warning of and escape time from Smoldering Fires—the most common type and deadliest form of home fires. Defendants have known about the safety hazard posed by their Ionization Smoke Alarms for decades, through testing, studies, scholarly articles, participation on industry standards committees and associations, and task groups. Defendants knew of the complaints lodged by consumers, consumer rights organizations, and fire safety professionals. But Defendants failed to alter their pattern of unfair and deceptive business practices by omission. Defendants' acts and omissions qualify as unsafe and unreasonable, profit-driven conduct in conscious disregard of the rights and safety of consumers, and everyone who unwittingly relies on their Ionization Smoke Alarms to adequately alert and protect them from home fires. As an immediate and

proximate cause of Defendants' conduct, Mr. Zito and Class members purchased

Ionization Smoke Alarms or a home with Ionization Smoke Alarms without the material

information reasonably necessary to make an informed choice. Had Defendants disclosed

the safety defect, neither Mr. Zito nor Class members would have purchased Ionization

Smoke Alarms, nor would any reasonable consumer.

### V. CLASS ALLEGATIONS

40.    Plaintiff seeks to represent the following Class:

> All persons in the United States who purchased an Ionization Smoke Alarm made,
> marketed, distributed, and/or sold by Defendants. Excluded from the Class are all
> persons who allege personal injury or property damage arising out of the failure
> of an Ionization Smoke Alarm made, marketed, distributed, and/or sold by
> Defendants; Defendants and their subsidiaries and affiliates; all persons who
> make a timely election to be excluded from the Class; governmental entities; and
> the Judge to whom this case is assigned and his/her immediate family.

Plaintiff reserves the right to revise the Class definition based upon information learned

through discovery.

41.    Certification of Plaintiff's claims for class-wide treatment is appropriate

because Plaintiff can prove the elements of his claims on a class-wide basis using the

same evidence as would be used to prove those elements in individual actions alleging

the same claim.

42.    This action has been brought and may be properly maintained on behalf of

the Class proposed herein under Federal Rule of Civil Procedure 23.

43.    <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of

the Class are so numerous and geographically dispersed that individual joinder of all

Class members is impracticable. While Plaintiff is informed and believes that there are

not less than tens of thousands of members of the Class, the precise number of Class

members is unknown to Plaintiff, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

44.     Commonality and Predominance. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether Defendants engaged in the conduct alleged herein;

b) Whether Defendants designed, advertised, marketed, distributed, sold, or otherwise placed Ionization Smoke Alarms into the stream of commerce in the United States;

c) Whether Defendants knew that their Ionization Smoke Alarms were defective;

d) Whether Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

e) Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

f) Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

45.     Typicality. Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

46.     <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

47.     <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

48.     <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I**
**VIOLATIONS OF THE UNFAIR TRADE PRACTICES ACT**
**(CONN. GEN. STAT. ANN. § 42-110A, *ET SEQ.*)**

49.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

50.     Plaintiff brings this Count on behalf of the Class.

51.     Plaintiff and Defendants are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

52.     The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). The CUTPA further provides a private right of action under Conn. Gen. Stat. Ann. § 42-110g(a).

53.     By failing to disclose and actively concealing the defects in the Ionization Smoke Alarms, Defendants engaged in unfair and deceptive practices prohibited by the CUTPA.

54.     As alleged above, Defendants made numerous material statements or omissions about the benefits and characteristics of the Ionization Smoke Alarms that were either false or misleading. Each of these statements contributed to the deceptive context of Defendants' unlawful representations and omissions as a whole.

55.     Defendants knew that the Ionization Smoke Alarms were defectively designed or manufactured, were not suitable for their intended use, and would not detect and timely alert Plaintiff to the presence of a smoldering fire to enable Plaintiff to escape his residence and avoid injury or death as a result of exposure to a Smoldering Fire.

Defendants nevertheless failed to warn Plaintiff about these defects despite having a duty to do so.

56.     Defendants owed Plaintiff a duty to disclose material facts about the Ionization Smoke Alarms and failed to discharge this duty, because Defendants:

i) Possessed exclusive knowledge of the defects rendering the Ionization Smoke Alarms much more unreliable than photoelectric smoke alarms for the timely detection of Smoldering Fires;

ii) Intentionally concealed the defects of Ionization Smoke Alarms through their advertising and packaging that they designed to hide the defects; and/or

iii) Made incomplete representations or wholesale omissions about the characteristics and performance of the Ionization Smoke Alarms generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

57.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true performance and characteristics of the Ionization Smoke Alarms.

58.     As a result of their violations of the CUTPA detailed above, Defendants caused actual damage to Plaintiff and Plaintiff has sustained an ascertainable loss.

59.     Plaintiff and the Class sustained damages as a result of the Defendants' unlawful acts and are, therefore, entitled to damages and other relief as provided under the CUTPA.

60.     Plaintiff also seeks court costs and attorneys' fees as a result of Defendants' violation of the CUTPA as provided in Conn. Gen. Stat. Ann. § 42-110g(d).

A copy of this Complaint has been mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with Conn. Gen. Stat. Ann. § 42-110g(c).

## COUNT II
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (CONN. GEN. STAT. ANN. § 42A-2-314)

61.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

62.     Plaintiff brings this Count on behalf of the Class.

63.     Defendants are and were at all relevant times merchants with respect to Ionization Smoke Alarms under Conn. Gen. Stat. Ann. § 42a-2-104(1).

64.     A warranty that the Ionization Smoke Alarms were in merchantable condition was implied by law in the instant transactions, pursuant to Conn. Gen. Stat. Ann. § 42a-2-314. These Ionization Smoke Alarms, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Ionization Smoke Alarms are inherently defective in that they do not and cannot reliably and timely detect the presence of the most common type of home fires, Smoldering Fires, and alert home occupants in sufficient time to allow them to avoid the effects of Smoldering Fires without suffering injury or death.

65.     Defendants were provided notice of these issues by numerous complaints filed against them, including the instant Complaint, and by other means.

66.     As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT III
## FRAUDULENT CONCEALMENT

67.     Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

68.     Plaintiff brings this Count on behalf of the Class.

69.     Defendants intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision. Defendants further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform packaging provided with each Ionization Smoke Alarm, that the Ionization Smoke Alarms they were selling were new, had no significant defects, and would perform and operate properly installed to detect  smoke from fires.

70.     Defendants knew these representations were false when made.

71.     The Ionization Smoke Alarms purchased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because they cannot detect and timely warn residents of the presence of a Smoldering Fire, as alleged herein.

72.     Defendants had a duty to disclose that these Ionization Smoke Alarms were defective, unsafe, and unreliable in that their crucial safety function of detecting and timely warning of Smoldering Fires cannot be performed, because Defendants' material representations that the Ionization Smoke Alarms they were purchasing were "Smoke Alarms" that were safe and free from defects was not a full and fair disclosure of actual limited capabilities of the Ionization Smoke Alarms, and Defendants assumed to speak about these matters.

73.     The aforementioned representations and concealment were material because if Defendants had fully and fairly disclosed that the Ionization Smoke Alarms cannot timely detect and warn of Smoldering Fires, Plaintiff and the other Class members would not have bought the Ionization Smoke Alarms, or would not have bought them at the prices they paid.

74.     Defendants knew or recklessly disregarded that their representations were false because they knew that the Ionization Smoke Alarms cannot detect or timely warn of Smoldering Fires. Defendants intentionally made the false statements in order to sell Ionization Smoke Alarms.

75.     As a result, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their Ionization Smoke Alarms.

76.     Defendants' conduct was knowing, intentional, demonstrated a complete lack of care, or was in reckless disregard for the rights of Plaintiff and the other Class members.

77.     Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A. Certification of the proposed Class, including appointment of Plaintiff's

counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Injunctive relief in the form of a recall or free replacement program;

D. Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

E. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F. An award of costs and attorneys' fees; and

G. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 18th day of May, 2015.          Respectfully submitted,

_____/s/ William Bloss_____
William Bloss
Federal Bar No. ct01008
bbloss@koskoff.com
Richard A. Bieder
Federal Bar No. ct04208
rbieder@koskoff.com
KOSKOFF KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, Connecticut  06604
203.336.4421
203.368.3244 (fax)

Marc R. Stanley
Federal Bar No. ct18179
marcstanley@mac.com
Martin Woodward
Federal Bar No. ct25263
mwoodward@stanleyiola.com
STANLEY LAW GROUP
3100 Monticello Avenue, Suite 770
Dallas, TX  75205
214.443.4300
214.443.0358 (fax)

Andrew S. Kierstead
ajkier@aol.com
LAW OFFICE OF ANDREW KIERSTEAD
1001 SW 5th Avenue, Suite 1100
Portland, OR 97204
Tel. (508) 224-6246
Fax (508) 224-4356

Peter N. Wasylyk
pnwlaw@aol.com
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, RI 02908
Tel. (401) 831-7730
Fax (401) 861-6064

*Counsel for Plaintiff and the Class*